Filed 3/17/21  P. v. Fletcher CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CORY LEE FLETCHER,<br><br>    Defendant and Appellant. | 2d Crim. No. B302780<br>(Super. Ct. No. 2016012804)<br>(Ventura County) |

A jury found appellant Cory Lee Fletcher guilty of eight counts of burglary of a structure (Pen. Code, §§ 459, 460, subd. (b); counts 1, 4, 7, 8, 9, 10, 11 and 12)[1] and four counts of first degree residential burglary (§§ 459, 460, subd. (a); counts 2, 3, 5 and 6).  As to counts 2, 3 and 5, the jury found true the allegation that a person other than appellant or an accomplice was in the residence at the time of the burglary (§ 667.5, subd. (c)(21)).  The jury also found appellant guilty of two counts of possession of a

_____

[1] All further statutory references are to the Penal Code unless otherwise stated.

controlled substance (Health & Saf. Code, § 11350, subd. (a); counts 13 and 14).

The trial court sentenced appellant to an aggregate prison term of 15 years, 4 months, consisting of: (1) the upper term of 6 years as to count 3; (2) 8 months (one-third the midterm) as to each of counts 1, 4, 7, 8, 9, 10, 11 and 12; (3) 16 months (one-third the midterm) as to each of counts 2, 5 and 6; and (4) a concurrent term of 180 days in county jail for each of counts 13 and 14. Appellant was ordered to pay fines, fees and restitution.

Only counts 2, 3 and 5 are at issue on appeal. Specifically, appellant challenges the sufficiency of the evidence as to the burglary conviction in count 2 and as to two of the findings that a person was in the residence during the burglary (counts 2 and 3). Appellant also claims the uncharged conspiracy instruction was defective because it allowed the jury to convict him of the burglary in count 5 without requiring it to find that he agreed and intended to commit that burglary. We affirm.

FACTUAL BACKGROUND

Appellant enlisted two teenagers, Karinna Cortez, with whom he had an intimate relationship, and Jason Andersen to help him carry out a string of 12 residential and school burglaries.

Three of the burglaries occurred at the residence of 88-year-old Janet Gray (Janet). Another occurred at the residence of Anthony Trembley (Anthony) and Kathryn Trembley (Kathryn). A fifth occurred at the apartment of Richard Medina, who lived across the hall from appellant. The rest occurred at area schools. We briefly discuss the school burglaries to the extent they relate to the counts at issue.

2

*The Gray Burglaries*

In 2016,[2] Janet lived alone in a single-family home in Camarillo. According to her daughter, Lynn Gray (Lynn), Janet was a sound sleeper who typically went to bed early and woke up early. Janet removed her hearing aids before going to bed, which left her "virtually deaf."

NELOS is a cell phone data system used to triangulate the approximate location of a cell phone at a particular time. NELOS data placed appellant's cell phone within 50 meters of Janet's residence at 12:46 a.m. on February 1. The cell phone had been transported to that location from Oxnard, which is where appellant lived, and then transported back to Oxnard at 1:30 a.m.

Between 3:00 and 4:00 a.m., Janet's Chase credit card was used at a Shell gas station in Oxnard. The Shell surveillance videotape was inconclusive. It revealed the presence of someone other than appellant during that time frame, but it is unclear whether that person paid for any item or used a credit card. The videotape also did not cover every area in which a customer could make a purchase.

After getting up that morning, Janet noticed that her purse, which contained her Chase and Target credit cards, was missing from a counter in her home. Janet immediately reported the loss to police. No other items were missing and there was no sign of forced entry.

At 6:06 p.m. on February 1, appellant's phone was used to search "[h]ow to order stuff online with a stole[n] credit card." Janet's Target card was used several days later. The store videotape showed appellant and Cortez purchasing items at a

---

[2] All referenced dates are to 2016.

cash register. The clerk processed the payment and returned Janet's card to appellant.

At 8:06 a.m. on February 23, appellant's phone was used to search "[h]ow thieves can hack and disable your home alarm system." The same phone was used to access the police blotter at 9:54 p.m. At 10:55 p.m., Cortez's phone was used to search the Ventura County Sheriff's patrol events webpage, which lists the calls for service by patrol officers. At about 11:00 p.m., appellant's and Cortez's cell phones were triangulated to be at or near Janet's residence.

A few hours later, on February 24, Janet called police to report another burglary. Detective Nora Soler[3] and others responded at approximately 3:00 a.m. After hearing from police, Lynn drove to Janet's house. The sliding glass door leading to the backyard was shattered and a window was broken. Valuable paintings, sculptures and jewelry were missing. Janet showed the officers photographs of her extensive paintings collection. Sergeant Brent Miller found a fragment of a blue rubber glove in Janet's front yard. The glove contained appellant's DNA. Similar gloves were later found in appellant's EZ storage unit.

Detective Soler spoke with Janet "[m]ultiple times" during the burglary investigations. At trial, the detective identified the bedroom in which Janet was sleeping during the first two burglaries. Janet had shown her the room, which was near the front door. Lynn assumed Janet had been sleeping there during the burglaries "because that's where she always slept."

---

[3] Detective Soler is employed by the Ventura County Sheriff's Office but was assigned to the Camarillo Police Department in 2016.

4

Fearing a third burglary, Janet moved in with Lynn. In the early morning hours of March 9, NELOS data again placed appellant's and Cortez's cell phones at Janet's home. A side window and a glass panel near the front door had been shattered, and the new alarm system had been disengaged and forcibly removed from the wall. More paintings had been taken. Toward the end of the burglary, Cortez sent Andersen a text saying appellant had "fucked up his hands" and was bleeding.

Detective Soler testified that Janet was at home during the burglaries on February 1 and February 24. She further testified that sometime between 1:23 a.m. and 4:31 a.m. on March 9, Janet's "residence was broken into a third and final time."

Police subsequently found many of the stolen items in the EZ storage unit rented by appellant and Cortez. Lynn identified those items belonging to Janet and they were returned to her. Janet passed away prior to trial.

*The Trembley Burglary*

On the evening of March 1, Anthony arrived at his home in Camarillo and parked in the attached garage. His wife Kathryn already was home, and her car also was parked in the garage. It was their practice to leave the side door to the garage unlocked. Anthony went to bed later that evening and did not leave his residence until the following morning.

Kathryn, who worked as a teacher at Dos Caminos Elementary School (Dos Caminos) in Camarillo, had a set of keys that accessed her classroom, the front office, the computer lab, the teacher staff lounge and an outside gate. Kathryn usually left the keys in a school bag inside her car. The car typically remained unlocked while parked in her garage.

5

At 9:20 p.m. on March 1, appellant's phone was used to search "how to disable the alarm system in your home." At the same time, there was a series of text messages between Cortez and appellant regarding whether she could go with him that night. Appellant agreed but said he was "going to the gym first" because he was "waiting on some inside information" from "Jay."

Shortly after midnight on March 2, appellant's phone was triangulated to be at or near the Trembley residence. At 1:04 a.m., appellant's phone was used to access the Pleasant Valley School District's website. Dos Caminos is within that district. A minute later, the phone searched for the Dos Caminos school layout. The phone did not return to Oxnard until approximately 4:00 a.m.

Later that same morning, Kathryn noticed that the bag containing the school keys was missing from her car. When she arrived at Dos Caminos, the police were investigating a burglary. Two laptops were missing from Kathryn's classroom. Other parts of the school had been ransacked. Medications were taken from the health offices and about 33 iPads and several more laptops were stolen. Kathryn's keys had provided access to some of the burglarized areas. The keys were never recovered.

On March 5, Anthony notified the Ventura County Sheriff's Office that several bottles of wine were missing from the garage refrigerator and that his iPod and sunglasses were missing from his car. The iPod was found in appellant's EZ storage unit.

*The School Burglaries*

The Dos Caminos burglary was the first of seven school burglaries. Sometime after 3:00 a.m. on March 17, appellant's and Cortez's phones were triangulated to be at the Rio School District's Office of Student Family Services in Oxnard. Several

6

windows were broken. Desktop and laptop computers were taken.

From the late evening of March 19 through 2:00 a.m. on March 20, appellant's phone was triangulated to be at the CAPE Charter School in Camarillo. The director's office window was broken and keys to the entire campus were removed from the key box. About 200 iPads, 50 laptop computers and other electronic equipment were missing.

Between 10:30 and 11:00 p.m. on March 22, NELOS data placed appellant's and Cortez's phones at Pinecrest School in Thousand Oaks. Someone had tampered with the school doors and electronic equipment was missing from the classrooms.

On March 22, from 11:35 p.m. through midnight, appellant's and Cortez's phones were triangulated to be at or near Westlake Montessori School. The security cameras were disabled and a bathroom window was broken. Computer equipment and food items were taken.

During the early morning hours of March 29, NELOS data placed appellant's and Cortez's phones at Montalvo Elementary School. School doors had been removed from their hinges, and electronic equipment and iPads were missing.

On March 31, deputy sheriffs responded to a call at 2:40 a.m. at Mesa Verde Middle School in Moorpark. Deputies saw Cortez running down a pathway from the school to the main road. She was saying, "Babe, babe, where are you?" Cortez told officers that she came to the school with a friend. A hole had been cut through a chain-link fence. A large glass door to the cafeteria had been shattered and other windows had been broken. Computers and electronic equipment were found in the

bushes, and 104 laptop computers were haphazardly stacked on a conference room table.

## DISCUSSION

### *Challenges to the Gray Burglary Convictions*

Appellant argues that (1) substantial evidence does not support the first burglary conviction (count 2) because there is no evidence of entry into Janet's residence to steal the purse and (2) substantial evidence does not support the jury's finding that Janet was at home during the first and second burglaries (counts 2 and 3). Both arguments lack merit.

We review the record in the light most favorable to the judgment to determine whether it discloses substantial evidence. (*People v. Snow* (2003) 30 Cal.4th 43, 66.) Substantial evidence is evidence that is "reasonable, credible and of solid value -- from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Ibid.*) From the evidence, we draw all inferences supporting the jury's verdict. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1382.) Before the judgment can be set aside for insufficient evidence, "it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the jury." (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429.) ""This standard applies whether direct or circumstantial evidence is involved."" (*People v. Thompson* (2010) 49 Cal.4th 79, 113.)

Modus operandi is a form of circumstantial evidence allowing a jury to infer two crimes ""were committed by the same person when the marks common to those offenses set them apart from other offenses of the same general variety."" (*People v. Green* (1983) 146 Cal.App.3d 369, 376.) A modus operandi alone

8

can be substantial evidence. (*People v. Rehmeyer* (1993) 19 Cal.App.4th 1758, 1765-1766.)

To prove burglary, the prosecution must show unlawful entry into a structure with the intent to commit a theft or any other felony. (§ 459; *People v. Anderson* (2009) 47 Cal.4th 92, 101.) Here, there is ample evidence that appellant or his accomplice entered Janet's residence on February 1 with the intent to steal. Janet was a heavy sleeper with a severe hearing impairment. She noticed her purse was missing after she got up that morning. Appellant's phone was triangulated to be within 50 meters of her house at 12:46 a.m. A short while later, the phone was transported to Oxnard, which is where appellant lived. Janet's Chase credit card, which had been in her purse, was used at a Shell station in Oxnard between 3:00 and 4:00 a.m. The station's videotape did not show who used the card, but later that evening, appellant's phone was used to search "[h]ow to order stuff online with a stole[n] credit card."

Several days later, appellant and Cortez used Janet's Target card to purchase merchandise. After the transaction was processed, the clerk returned the card to appellant.

The police initially were unsure whether a burglary had occurred on February 1. The decisive factor was the phone data. Detective Soler explained that after Janet reported that someone was using her Chase credit card, "[w]e established that it was used at [the] Shell gas station and a Target. . . . Two weeks later on the 24th when I responded to [that] burglary, . . . I didn't know the first one was a burglary. I remembered that report. We still hadn't established there was a burglary on [February] 1st until later on when we analyzed the phone locations."

9

The NELOS data placed appellant's phone at the first and third burglaries and his DNA was left on a glove fragment found after the second burglary. Appellant also was present at all but one of the school burglaries, which occurred in the middle of the night and, for the most part, were facilitated by breaking windows and doors and disabling alarm systems. This same fact pattern, or modus operandi, kept occurring where unlawful entry was unmistakable.

Moreover, appellant and/or Cortez entered the Trembley residence through an unlocked door, and it is possible a similar point of entry was used to access Janet's home on February 1. There is no question Janet tightened security after that date. Lynn instructed her again on how to set the existing security alarm and, after the second burglary, they installed a new security system. But neither of these precautions prevented the further burglaries.

It was reasonable for the jury, therefore, to find that appellant committed a burglary on February 1. He was at or near Janet's home in the early morning hours, took the purse from a counter or directed an accomplice to do so, used Janet's Chase card at the Shell station in Oxnard, searched the internet regarding ways to use a stolen card to purchase items online and then used the stolen Target card several days later. The burglary also allowed appellant to assess what items may be worth stealing at a later date.

It also was reasonable for the jury to find that Janet was present in the residence during the first two burglaries. (See § 667.5, subd. (c)(21).) She did not sleep in the master bedroom, which is where her jewelry was kept. She slept in a bedroom on the north side of the house by the front door. Nothing was

10

reported stolen from that room.  Detective Soler, who investigated all three burglaries, testified that Janet was sleeping in that bedroom during the first two burglaries.  The detective was asked:  "Had [Janet] been home the first two times that her house was broken into?"  She responded, "Yes."

The jury was instructed that "the testimony of only one witness can prove any fact."  (See CALCRIM No. 301; *People v. Barnes* (1986) 42 Cal.3d 284, 303-304 [absent inherent improbability or apparent falsity, the testimony of one witness, if believed, is sufficient to sustain a conviction].)  Not only was Detective Soler's testimony compelling, but Lynn also corroborated much of it.  And during closing argument, the prosecutor reminded the jury it was uncontested that "Janet slept [at home] every night and she was there on the night of both . . . burglaries."  We conclude substantial evidence supports the jury's finding.

*Challenge to the Trembley Burglary Conviction*

The jury was instructed with three sets of uncharged conspiracy instructions patterned after CALCRIM No. 416.  Each instruction pertained to a different set of charges, i.e., (1) the Gray burglaries, (2) the "burglary of schools" and (3) the Medina burglary.  There was no separate uncharged conspiracy instruction for the Trembley burglary.  It was included as an "overt act" in the "burglary of schools" instruction.

The "burglary of schools" instruction stated:  "To prove that a defendant was a member of a conspiracy in this case, the People must prove that:  [¶] 1. The defendant intended to agree and did agree with one or more of Karinna Cortez or Jason Anderson [sic] to commit burglary of schools in Ventura County, to steal computers, and to sell the computers for money or drugs; [¶] 2. At

11

the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit burglary of schools in Ventura County to steal computers and to sell the computers for money or drugs . . . ."

Appellant claims this instruction was defective because it allowed the jury to convict him of the Trembley burglary without requiring it to find that he agreed to and intended to commit that specific burglary. He argues the instruction deprived him of his due process right to have the jury adjudicate the intent element of that crime.

We need not decide this issue because any such error, assuming it occurred, was harmless. As appellant concedes, "an erroneous instruction that omits an element of an offense is subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705]." [Citations.] "[T]he *Chapman* test probes 'whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."'" (*People v. Gonzalez* (2012) 54 Cal.4th 643, 663.)

Thus, "even when jury instructions completely omit an element of a crime, and therefore deprive the jury of the opportunity to make a finding on that element, a conviction may be upheld under *Chapman* where there is no 'record . . . evidence that could rationally lead to a contrary finding' with respect to that element." (*People v. Davis* (2005) 36 Cal.4th 510, 564 (*Davis*).) To make this determination, the reviewing court must "'conduct a thorough examination of the record. If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the

12

error -- for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding -- it should not find the error harmless.' [Citation.] On the other hand, instructional error is harmless 'where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence.' [Citations.] Our task, then, is to determine 'whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element.' [Citations.]" (*People v. Mil* (2012) 53 Cal.4th 400, 417; see *Neder v. United States* (1999) 527 U.S. 1, 17 [144 L.Ed.2d 35]; *People v. Sandoval* (2007) 41 Cal.4th 825, 839 ["[I]f a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true" the finding in question, "the . . . error properly may be found harmless"].)

Here, the prosecutor relied on three alternative theories to establish appellant's culpability for the Trembley burglary: (1) perpetrator liability, (2) aider and abettor liability and (3) uncharged conspiracy liability. The jury was instructed on all three theories. It is possible the jury convicted appellant as the actual perpetrator or as an aider or abettor, but the evidence is overwhelming and uncontradicted that he conspired with Cortez to commit the burglary.[4]

The Trembley burglary occurred between March 1 and March 2. At 9:20 p.m. on March 1, appellant's phone was used to search "[h]ow to disable the alarm system in your home." At about the same time, there was a series of text messages between Cortez and appellant. Cortez asked, "Can I go with you?" She

_____

[4] Andersen had yet to join the conspiracy.

13

added, "Please.  Please.  Please."  Appellant agreed, but said he was "going to the gym first" because he was "waiting on some inside information" from "Jay."  Cortez said she was "going to start getting ready."

The record confirms that appellant, with Cortez's knowledge and assistance, had specifically targeted the Trembley residence, searched how to disable a residential security alarm and delayed the burglary pending the anticipated receipt of "inside information."  Shortly after midnight on March 2, NELOS data placed appellant's phone at or near the Trembley residence.  The burglary was limited to the garage, which was entered through an unlocked side door.  Kathryn's Dos Caminos keys were taken from her car and an iPod and sunglasses were taken from Anthony's car.  Appellant apparently was aware of the keys' significance because at 1:04 a.m., his phone was used to search the Pleasant Valley School District website.  The phone then searched for the Dos Caminos school layout.

Dos Caminos was burglarized later that morning.  Kathryn's keys were used to access parts of the school.  Her keys also facilitated access to a "sub-custodian key" which unlocks every room on campus, including the principal's office.  The principal's safe was stolen, and school laptops and other electronic equipment were taken.  Anthony's iPod and some of Dos Caminos's equipment were later recovered from the EZ storage unit rented by appellant and Cortez.

The record is clear that appellant and Cortez conspired to commit the Trembley burglary.  They texted each other beforehand and agreed they both would participate.  It is evident that had the jury been instructed on the intent necessary to support an uncharged conspiracy conviction as to that burglary,

14

it would have found such intent.  (See CALCRIM No. 416.)  There was no evidence that rationally could have led the jury to find otherwise.  (*Davis*, *supra*, 36 Cal.4th at p. 564.)  Accordingly, any error in the instruction was harmless beyond a reasonable doubt.  (*Ibid.*)

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.

PERREN, J.

We concur:

YEGAN, Acting P. J.

TANGEMAN, J.

15

F. Dino Inumerable, Judge
Superior Court County of Ventura
_____

Wayne C. Tobin, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and John Yang, Deputy Attorney General, for Plaintiff and Respondent.